# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ESMERALDA MARTINEZ,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1]<br><br>Defendant. | No. 12 C 3888<br><br>Magistrate Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Esmeralda Martinez filed this action seeking review of the final decision of the Commissioner of Social Security (Commissioner) denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (SSA). 42 U.S.C. §§ 216(i), 223(d), 1614(a)(3)(A). The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

# I. SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the SSA.[2] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

"The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on March 17, 2006, alleging that she became disabled on September 16, 2005, due to lower back pain. (R. at 113, 149). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id*. at 106–09, 113, 152). On February 22, 2008, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id*. at 113). The ALJ denied Plaintiff's request for benefits on April 24, 2008. (*Id*. at 113–20).

On August 18, 2009, the Appeals Council granted Plaintiff's request for review, vacated the April 2008 decision, and remanded. (R. at 121–23). The Appeals Council determined that the April 2008 decision did not identify Plaintiff's severe impairments and did not contain an adequate evaluation of treating source opinions. (*Id*. at 122). Upon remand, the Appeals Council ordered the ALJ to evaluate Plaintiff's severe impairments and give further consideration to the treating source opinions in accordance with the applicable regulations. (*Id*. at 123). The Appeals Council also ordered the ALJ to "offer [Plaintiff] an opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision." (*Id*.).

On remand, Plaintiff, represented by counsel, testified at a hearing on June 16, 2010, before an ALJ.[3] (R. at 38, 55–105). The ALJ also heard testimony from Ashok G. Jilhewar, M.D., an impartial medical expert (ME), and Lee O. Knutson, a vocational expert (VE). (*Id*. at 38, 55–105, 306–07, 309–10).

The ALJ denied Plaintiff's request for benefits on November 22, 2010. (R. at 38–49). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since September 16, 2005, the alleged onset date. (*Id*. at 40). At step two, the ALJ found that Plaintiff's low back pain due to small disc protrusions at L4-5 and L5-S1, and, as of September 3, 2009, degenerative disc disease of the cervical spine and cervical radiculopathy, as well as thoracic or lumbosacral neuritis or radiculitis are severe impairments. (*Id*. at 40–41). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id*. at 41–42).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[4] and determined that she has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that

> prior to September 3, 2009, she could only occasionally climb ramps and stairs and could never climb ladders, ropes, or scaffolds. She could

---

[3] Upon remand, the case was assigned to a different ALJ. (*Compare* R. at 38–49 *with id*. at 113–20).

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

frequently balance, stoop, kneel, crouch, and crawl. Effective September 3, 2009, [Plaintiff] has additional limitations of frequent use of her right upper extremity and only occasional use of her left upper extremity.

(R. at 42). At step four, based on Plaintiff's RFC and the VE's testimony, the ALJ determined that prior to September 3, 2009, Plaintiff was capable of performing past relevant work as a machine operator and secretary/dispatcher. (*Id.* at 47). Beginning on September 3, 2009, Plaintiff is unable to perform any past relevant work. (*Id.*). At step five, based on Plaintiff's RFC, age, education, work experience, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including usher and parking lot attendant. (*Id.* at 47–48). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 48–49).

The Appeals Council denied Plaintiff's request for review on February 15, 2012. (R. at 23–27). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in gen-

eral, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

Plaintiff began treating with Claudia Vera, M.D. in October 2004. (R. at 477–78). On October 14, 2004, Plaintiff presented with chronic back pain. (*Id.* at 477). Upon examination, Dr. Vera found lower back muscle tenderness, no muscle spasms or

rigidity, and no tenderness over kidneys. (*Id.*). Plaintiff had a limited range of motion in her lumbar spine—flexion/extension to 60° and lateral flexion to 15°. (*Id.*). Dr. Vera diagnosed back disorder NOS and backache NOS and prescribed Soma and Ultram.[5] (*Id.* at 478). On July 8, 2005, Plaintiff was no longer taking medications and reported that her back pain was "resolved." (*Id.* at 479). In September 2005, Plaintiff did not report any back pain, and on musculoskeletal examination, no obvious deformities, muscle weakness, or atrophy were identified. (*Id.* at 481–84).

On February 15, 2006, Plaintiff presented with back pain and reported chronic back ache radiating to her lower extremities for the prior several months. (R. at 485). Upon examination, Dr. Vera found limited range of motion in the lumbar spine, lower back muscle tenderness, no muscle spasms, no muscle rigidity, and no tenderness over kidneys. (*Id.*). Dr. Vera ordered an MRI, diagnosed backache NOS, and renewed Plaintiff's Soma and Ultram prescriptions. (*Id.* at 486).

The MRI of Plaintiff's lumbar spine was performed on February 16, 2006. (R. at 468–69). The MRI revealed mid-sized central and left paracentral disc protrusion at the L4-5 level contiguous with the left L5 nerve root, and a moderate-sized central disc protrusion at the L5-S1 level. (*Id.*). However, these protrusions caused no spinal stenosis or nerve root displacement. (*Id.*). The L2-3 and L3-4 levels were unremarkable. (*Id.* at 468).

---

[5] Soma (carisoprodol) is an oral muscle relaxer, used for the short-term relief of acute painful muscle and skeletal conditions. Ultram (tramadol) is an analgesic, used in the management of moderate to moderately severe pain. <www.medicinenet.com>

On May 25, 2006, Francis Vincent, M.D., a DDS nonexamining physician, completed a physical RFC assessment on behalf of the Commissioner. (R. at 492–99). Dr. Vincent concluded that Plaintiff was capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, and could sit, stand, and walk for six hours in an eight-hour workday. (*Id.* at 493). Dr. Vincent also concluded that Plaintiff can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds. (*Id.* at 494). On July 13, 2006, Dr. Vincent's evaluation was affirmed by Michael Nenaber, M.D., another DDS nonexamining physician. (*Id.* at 500–01).

On November 9, 2006, Dr. Vera completed a physical RFC assessment. (R. at 505–07). She diagnosed lower back pain, lumbar disc disease, and herniation at multiple levels, which Plaintiff has had since approximately 2005 and which has worsened over the prior six months. (*Id.* at 505). Dr. Vera opined that Plaintiff is unable to stand or walk and can sit only one hour during an eight-hour workday. (*Id.* at 506). She concluded that Plaintiff can occasionally lift 10 pounds and frequently lift 5 pounds. (*Id.*). Dr. Vera stated that side effects of Plaintiff's medications include sedation, and Plaintiff is markedly limited in her ability to complete a normal workday without interruptions; markedly limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods; and significantly deficient in her ability to sustain concentration, persistence, and pace. (*Id.* at 507).

On November 10, 2006, Plaintiff presented with lower back pain, radiating to both sides. (R. at 518). On examination, Plaintiff's straight leg raising tests were

negative, but she had pain with flexion and extension.[6] (*Id.* at 519). Dr. Vera diagnosed back ache, continued Vicodin,[7] and prescribed Soma. (*Id.*).

On December 7, 2006, Plaintiff reported her pain was better. (R. at 520). Plaintiff's examination was unremarkable. (*Id.* at 521). Dr. Vera diagnosed degeneration of lumbar or lumbosacral intervertebral disc. (*Id.*).

On March 30, 2007, an EMG and nerve conduction study was performed. (R. at 535–36). The results were unremarkable. (*Id.* at 535). No evidence of peripheral neuropathy, cervical radiculopathy, or lumbosacral radiculopathy was found. (*Id.*).

On May 10, 2007, Plaintiff reported that her back pain was better and that she was trying not to take Vicodin. (R. at 546–47). Dr. Vera did not conduct a musculoskeletal examination. (*Id.* at 546–47). On May 31, 2007, Plaintiff presented for a follow-up and did not complain of any back pain. (*Id.* at 548). No musculoskeletal examination was performed. (*Id.* at 548–49).

Plaintiff performed physical therapy in July and August 2007. (R. at 532–34, 556). On discharge, Plaintiff "had full range of motion and demonstrated good posture and body mechanics." (*Id.* at 556). "She also had no impairments whatsoever." (*Id.*). By her final session, Plaintiff "had no pain or functional limitations." (*Id.*).

---

[6] "[T]he straight-leg-raise test is the most sensitive test for lumbar disk herniation, with a negative result strongly indicating against lumbar disk herniation." <www.aafp.org/afp/2008/1001/p835.html>

[7] Vicodin contains a narcotic pain reliever (hydrocodone) and a nonnarcotic analgesic (acetaminophen) and is prescribed for relief of moderate to moderately severe pain. <www.medicinenet.com>

On September 17, 2007, a second MRI was performed on Plaintiff's lumbar spine. (R. at 552). The results were "entirely unchanged from the previous exam." (*Id.*). The MRI found degenerative changes in the discs at L4-5 and L5-S1. (*Id.*). It also found that contact is made with the L5 root, but the root was not thickened or displaced. (*Id.*).

In September, October, and December 2007, Plaintiff presented with no complaints of back pain. (R. at 565, 567, 569). Dr. Vera discontinued Soma. (*Id.* at 570).

On January 2, 2008, Plaintiff presented with joint pain and stiffness in her hands. (R. at 563–64). On examination, Dr. Vera found palpitation of the left hand and tenderness in both hands, but noted that Plaintiff was in "no distress." (*Id.*). Dr. Vera adjusted Plaintiff's Vicodin dosage. (*Id.* at 564).

On January 23, 2008, Plaintiff presented with "bilateral joint pain and stiffness in hands, both much better." (R. at 561). She had "[n]o other complaints." (*Id.*). On musculoskeletal examination, Dr. Vera noted "decreased pain with range of motion, no joint edema, improved range of motion." (*Id.* at 562). She prescribed nabumetone and adjusted Plaintiff's prednisone prescription.[8] (*Id.*).

On May 6, 2009, Plaintiff reported increased back pain radiating into her left leg. (R. at 580). She stated that she was not interested in surgery. (*Id.*). Dr. Vera

---

[8] Nabumetone is used to manage mild to moderate pain. Prednisone is an anti-inflammatory drug. <www.medicinenet.com>

prescribed prednisolone (Medrol), Vicodin, and Flexeril,[9] and advised Plaintiff to go to the hospital if symptoms worsened. (*Id.*).

On September 3, 2009, Plaintiff presented with numbness and weakness in her left arm, along with palpitations. (R. at 587–88). On examination, Dr. Vera found no current palpitations. (*Id.* at 587). She referred Plaintiff to the hospital for tests. (*Id.* at 588). The hospital results, including an MRI of Plaintiff's brain, were normal. (*Id.* at 589). Because Plaintiff's symptoms were associated with headaches, Dr. Vera suggested Plaintiff get a neurological evaluation. (*Id.*).

On September 23, 2009, Plaintiff presented with lower back pain. (R. at 591). Her symptoms are aggravated by daily activities and relieved with Vicodin. (*Id.*). Dr. Vera prescribed Medrol, referred Plaintiff to neurology, and ordered an EMG. (*Id.* at 592).

An EMG and nerve conduction study was performed on October 5, 2009. (R. at 594–95, 621–22). The nerve conduction study results were normal. (*Id.* at 594, 621). The EMG found mild to moderate radiculopathy at C6-7, L4-5, and L5-S1. (*Id.* at 595, 621–22).

A third MRI was performed on October 9, 2009. (R. at 610–11). The results were generally unremarkable. (*Id.*) Mild degenerative changes of the cervical spine causing minimal neural foraminal narrowing was found, but no significant central canal stenosis was seen. (*Id.* at 610). The lumbosacral spine was normal. (*Id.* at 611).

---

[9] Flexeril (cyclobenzaprine) is a muscle relaxant, which is used with rest and physical therapy for short-term relief of muscle spasms associated with skeletal conditions. <www.medicinenet.com>

Computed tomography angiography (CTA) scans of Plaintiff's neck and head were normal. (*Id.* at 608–09).

On November 24, 2009, Plaintiff's back pain was "stable." (R. at 598). Plaintiff described pain as "an ache," which is aggravated by daily activities and relieved with medications. (*Id.*). Recent MRIs found cervical and thoracic disc disease. (*Id.*). Plaintiff indicated she was "not interested in surgery at this time." (*Id.*). Dr. Vera diagnosed chronic/persistent thoracic or lumbosacral neuritis or radiculitis, discontinued Medrol, and prescribed Lyrica.[10] (*Id.* at 599–600).

On December 8, 2009, Plaintiff reported persistent lower back pain radiating to her legs. (R. at 601). She described pain as numbness and sharp, which is aggravated by changing positions and daily activities and relieved by pain medications. (*Id.*). Associated symptoms include tingling in the arms and legs, and weakness in her left arm. (*Id.*). On examination, Dr. Vera found no tenderness in the lumbar spine and moderately reduced range of motion. (*Id.* at 602).

On the same day, Dr. Vera completed a lumbar spine RFC questionnaire. (R. at 574–78.) Based on MRIs and EMGs showing cervical and lumbar disc disease and nerve impingement, she diagnosed lumbar and cervical degenerating discs with myelopathy. (*Id.* at 574). Plaintiff's symptoms include low back pain, neck pain, left arm and leg numbness, and occasional right leg numbness. (*Id.*). Plaintiff's pain is moderate to severe and is aggravated by activity and changes in weather. (*Id.*). Dr.

---

[10] Lyrica (pregabalin) is used for treating pain caused by neurological diseases. <www.medicinenet.com>

Vera reported a 50% reduction in Plaintiff's range of motion at the cervical and lumbar spine, positive straight leg raising test at 20°, sensory loss, muscle spasms, and muscle weakness. (*Id.* at 575). Dr. Vera opined that Plaintiff's pain would frequently interfere with Plaintiff's attention and concentration needed to perform even simple work tasks. (*Id.*). Plaintiff experiences side effects from Lyrica and Vicodin, including sedation and tiredness. (*Id.*). Dr. Vera opined that Plaintiff can walk only one block without rest or severe pain, can sit for only 15 minutes before needing to get up, can stand for only 5 minutes, and can sit, stand, and walk less than 2 hours in an 8-hour day. (*Id.* at 575–76). Plaintiff will need the ability to sit/stand/walk at will and to take unscheduled breaks every hour. (*Id.* at 576). She can occasionally lift less than 10 pounds; rarely twist, stoop, or crouch; never climb ladders; occasionally climb stairs; and is significantly limited in reaching, handling, or fingering. (*Id.* at 577). Dr. Vera opined that Plaintiff would likely miss more than four days of work a month because of her impairments. (*Id.*).

On January 27, 2010, Plaintiff reported that her back pain was stable. (R. at 623). On examination, Dr. Vera found moderately reduced range of motion. (*Id.* at 624). On February 24 and March 3, 2010, Plaintiff did not report any back pain symptoms to Dr. Vera. (*Id.* at 626–30). On examination, Dr. Vera found mild musculoskeletal pain with motion and moderately reduced range of motion. (*Id.* at 632). On April 27, 2010, Plaintiff complained of moderate neck pain but did not report any back pain. (*Id.* at 634). On examination, Dr. Vera found muscle spasm in the

cervical spine and moderately reduced range of motion. (*Id.* at 635). She prescribed Medrol for the neck pain. (*Id.* at 634, 636).

Beginning in March 2006, Plaintiff treated briefly with Tamir Hersonskey, M.D. (R. at 509). On May 10, 2006, Dr. Hersonskey completed a neurological report at the request of the Commissioner. (*Id.* at 472–74). He diagnosed low back pain. (*Id.* at 472). Dr. Hersonskey found that Plaintiff's neurological findings were within normal limits and that a March 2006 EMG was normal. (*Id.* at 472–74). He opined that Plaintiff could ambulate normally without any assistance. (*Id.* at 473). On August 4, 2006, Dr. Hersonskey completed a physical RFC assessment. (*Id.* at 509–11). He described Plaintiff's symptoms as low back pain radiating to legs, caused by small disc protrusion at L4-5, which was being treated by physical therapy. (*Id.* at 509). Dr. Hersonskey stated that Plaintiff's symptoms showed "much improvement" with physical therapy, and can improve further after she completes her physical therapy regimen. (*Id.*). He opined that Plaintiff could stand, walk, and sit up to two hours uninterrupted, and can lift up to 15–20 pounds. (*Id.* at 510). Dr. Hersonskey concluded that other than occasional rest periods, Plaintiff would have no marked limitations in her ability to complete a normal workday or work at a consistent pace. (*Id.* at 511). He further concluded that Plaintiff would not experience any significant deficiencies in her ability to sustain concentration, persistence, or pace. (*Id.*).

At the hearing, Plaintiff testified that she has lower back pain that radiates to her left leg. (R. at 65). She also has occasional pain in her neck, which radiates down to her left arm. (*Id.* at 77). The pain is exacerbated by cold and humidity. (*Id.*

at 65). When the pain gets worse, she has trouble concentrating. (*Id.* at 78). She takes pain medications, but only about four days a week when the pain is "real severe" because she does not want to become addicted. (*Id.* at 69, 81). Some of her pain medications cause drowsiness and others prevent her from sleeping. (*Id.* at 66–67, 69).

Plaintiff testified that she can walk only four blocks. (R. at 70). She can stand for 15–20 minutes and sit for 15–20 minutes before needing to get up and walk around. (*Id.* at 70–71). She needs to alternately sit and stand to alleviate the pain. (*Id.* at 78). She is able to lift a gallon of milk "and that's it." (*Id.* at 71). Her hand gets stiff or numb from writing too much. (*Id.*). She can bend "to a certain point." (*Id.* at 72).

When she is feeling good, Plaintiff catches up on her housework. (R. at 68). She is able to cook "probably three days a week." (*Id.* at 70). She spends two hours a day helping her children with their homework. (*Id.* at 72).

The ME opined that Plaintiff has a degenerative disc disease of her lumbar spine. (R. at 83–84). She has chronic low back pain but no neurological abnormalities on her clinical exam. (*Id.* at 84). In August 2007, following her physical therapy sessions, Plaintiff experienced no pain and no functional limitations. (*Id.*). The ME concurred with the DDS physician's RFC. (*Id.* at 85). He observed that the RFCs assessed by Drs. Vera and Hersonskey were not supported by any clinical findings. (*Id.* at 85–87). In reviewing the medical record, the ME found that other than "some decrease in [Plaintiff's] movement—which is not quantified—of lumbar flexion, no other significant specific clinical findings are documented." (*Id.* at 86). MRIs in Feb-

ruary 2006 and August 2007 "showed two-level disc degeneration at L4-5 [and] L5-S1, without significant neural foraminal narrowing or a central canal stenosis." (*Id.* at 87).

The ME concluded that beginning on September 3, 2009, Plaintiff has an additional limitation. (R. at 88). Because of numbness in her left arm, she is limited to occasional gross and fine manipulation with her left hand. (*Id.*).

On examination by Plaintiff's attorney, the ME acknowledged that Plaintiff's radiculopathy *could* cause the degree of pain alleged by Plaintiff. (R. at 93–94). However, the ME opined that Plaintiff's treatment for her low back pain was conservative. (*Id.* at 91).

> Except for the medication, I do not see any specific pain management, such as additional physical therapy, epidural injections, pain clinic referrals. . . . [E]ach [person's] pain is an individual symptom. I mean, what the person's feeling, one that doesn't have to have [] specific signs [] to say that the person has the pain or not, I have to go with what is the intensity of the management. If the person has a[n] extremely serial [] pain, there will be some management [] for their serial pain.

(*Id.*).

## V. DISCUSSION

Plaintiff raises three arguments in support of her request for remand: (1) the ALJ erroneously rejected the opinions of Plaintiff's treating physicians; (2) the ALJ's credibility determination was not supported by substantial evidence; and (3) the step four and five findings are flawed. (Mot. 1, 8–15).

## A. Treating Physicians

Plaintiff contends that the ALJ failed to give proper weight to the opinions of Drs. Vera and Hersonskey, her treating physicians. (Mot. 8–10). Plaintiff argues that the ALJ erred in giving more weight to the ME's opinion than the opinions of her treating physicians. (*Id.*).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In sum, "whenever

an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

### 1. Dr. Vera

In November 2006, Dr. Vera completed a physical RFC assessment. (R. at 505–07). Dr. Vera opined that Plaintiff is unable to stand or walk in an eight-hour workday and can sit for only one hour during the workday. (*Id.* at 506). She concluded that Plaintiff can occasionally lift 10 pounds and frequently lift 5 pounds. (*Id.*). Dr. Vera also opined that Plaintiff could occasionally bend, push, and pull, but could not perform any overhead reaching. (*Id.* at 506–07).

In December 2009, Dr. Vera completed a lumbar spine RFC questionnaire. (R. at 574–78.) Dr. Vera opined that Plaintiff can walk only one block without rest or severe pain, can sit for only 15 minutes before needing to get up, can stand for only 5 minutes, and can sit, stand, and walk less than 2 hours in an 8-hour day. (*Id.* at 575–76). Plaintiff will need the ability to sit/stand/walk at will and to take unscheduled breaks every hour. (*Id.* at 576). She can occasionally lift less than 10 pounds; rarely twist, stoop, or crouch; never climb ladders; occasionally climb stairs; and is significantly limited in reaching, handling, or fingering. (*Id.* at 577). Dr. Vera opined that Plaintiff would likely miss more than four days of work a month because of her impairments. (*Id.*).

In her decision, the ALJ assigned Dr. Vera's opinions little weight:

[The ME] testified that the only clinical abnormality noted by Dr. Vera in her treatment notes is low back pain and was first documented on October 14, 2004. [The ME] noted that except for some degree of movement and flexion limitations, Dr. Vera did not document any other specific clinical findings. [The ME] noted that two MRIs of [Plaintiff's] lumbar spine were performed—one in February 2006 and the other in September 2007. He noted that there was no interval change between the two MRIs and that both studies showed two level disc protrusions at L4-5 and L5-S1 with no significant neuro forminal narrowing or central canal stenosis. He also indicated that the physical therapy notes regarding no functional limits are such that one would expect and [*sic*] residual functional capacity consistent with the State Agency. I assign Dr. Vera's [November 2006 and December 2009] opinions little weight. They are too restrictive and are not supported by the objective findings, as noted by [the ME].

(R. at 45–46) (citations omitted). After carefully reviewing the medical evidence and Plaintiff's arguments, the Court concurs with the ALJ's assessment.

Plaintiff contends that Dr. Vera's opinions were supported by the MRI and EMG results. (Mot. 9). She argues that the MRIs "document[] the existence of disc herniation and nerve irritations for the entire time in question." (*Id.*). On the contrary, while the MRIs support that Plaintiff has degenerative disc disease, the ME testified that they do not support the limitations opined by Dr. Vera. (R. at 85–87). The February 2006 MRI revealed mid-sized central and left paracentral disc protrusion at the L4-5 level contiguous with the left L5 nerve root, and a moderate-sized central disc protrusion at the L5-S1 level. (*Id.* at 468–69). However, these protrusions cause no spinal stenosis or nerve root displacement. (*Id.*). The results of the September 2007 MRI were "entirely unchanged from the previous exam." (*Id.* at 552). Similarly, the results of the March 2007 EMG and nerve conduction study were un-

remarkable. (*Id.* at 535–36). No evidence of peripheral neuropathy, cervical radiculopathy, or lumbosacral radiculopathy was found. (*Id.* at 535).

In her December 2009 RFC, Dr. Vera stated that Plaintiff has a 50% reduction in range of motion of her cervical spine and a positive straight leg raising test at 20°. (R. at 575). However, as Plaintiff acknowledges (Mot. 9), these results do not appear anywhere in the treatment records. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("A treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record.") (citation omitted); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("We must keep in mind the biases that a treating physician may bring to the disability evaluation. The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.") (citation omitted).

Plaintiff also argues that the ME acknowledged that her conditions could reasonably cause the reported pain. (Mot. 10). Plaintiff mischaracterizes the ME's opinion. While the ME testified that Plaintiff's disc disease *could* cause the alleged pain, he explained that Plaintiff's conservative treatment belied Dr. Vera's opinions. (R. at 91–94). The ME explained that someone with extreme pain would pursue aggressive pain management, such as more physical therapy, epidural injections, or a pain clinic referral. (*Id.* at 91).

The medical record supports the ME's conclusion that Plaintiff's lower back pain was controlled by conservative treatment. Plaintiff often commented that her lower back pain was under control and that she did not need her medications. (R. at 479, 520, 546, 623). On frequent visits to Dr. Vera, Plaintiff had *no* complaints of back pain. (*Id.* at 481–84, 548, 562, 565, 567, 569, 626–30, 634). On other visits, Plaintiff's back pain was described as merely an "ache." (*Id.* at 478, 486, 519, 598). And Plaintiff's physical therapy regimen resulted in "no pain or functional limitations." (*Id.* at 556). On discharge from physical therapy in May 2007, Plaintiff "had full range of motion and demonstrated good posture and body mechanics." (*Id.*). "She also had no impairments whatsoever." (*Id.*).

Finally, the ALJ did not completely reject Dr. Vera's opinions. Instead, the ALJ explicitly accommodated Plaintiff's subjective complaints to Dr. Vera by limiting her "to light work with only occasionally climbing ramps and stairs and never climb ladders, ropes [or] scaffolds." (R. at 44).

### 2. Dr. Hersonskey

In May 2006, Dr. Hersonskey completed a neurological report. (*Id.* at 472–74). He diagnosed low back pain. (R. at 472). He found that Plaintiff's neurological findings were within normal limits and that a March 2006 EMG was normal. (*Id.* at 472–74). He opined that Plaintiff could ambulate normally without any assistance. (*Id.* at 473). Three months later, Dr. Hersonskey completed a physical RFC assessment. (*Id.* at 509–11). He found that Plaintiff's symptoms showed "much improvement" with physical therapy, and can improve further after she completes her phys-

ical therapy regimen. (*Id.*). He opined that Plaintiff could stand, walk, and sit up to two hours uninterrupted,[11] and can lift up to 15–20 pounds. (*Id.* at 510). Dr. Hersonskey concluded that other than occasional rest periods, Plaintiff would have no marked limitations in her ability to complete a normal workday or work at a consistent pace. (*Id.* at 511). He further concluded that Plaintiff would not experience any significant deficiencies in her ability to sustain concentration, persistence, and pace. (*Id.*).

The ALJ gave Dr. Hersonskey's opinion "little weight":

> Dr. Hersonskey's opinion [in August 2006] is inconsistent with his opinion from three months earlier, in which he indicated that [Plaintiff's] physical findings were all normal. Therefore, I find that Dr. Hersonskey's opinion is entitled to little weight. However, I note that even with the limitations indicated [in August 2006], the vocational expert testified that [Plaintiff] could perform sedentary jobs . . . if [Plaintiff] could alternate sitting and standing every two hours.

(R. at 45). (citations omitted).

Plaintiff argues that Dr. Hersonskey's August 2006 opinion is not contradicted by his July 2006 opinion. (Reply 1–2). She contends that the July 2006 opinion did not address her physical capacity or work-related limitations. (*Id.* at 2). While Plaintiff is correct that the July 2006 opinion was a neurological report and the August 2006 opinion a physical RFC, the July 2006 opinion nevertheless contradicts

---

[11] Such limitations would disqualify Plaintiff from even sedentary work. *See* Social Security Ruling (SSR) 83-12, at *4. SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

the August 2006 findings. In July 2006, Dr. Hersonskey found that Plaintiff's senso-ry changes, reflex changes, motor changes, ataxia, ambulation, manipulative limita-tions, and mental state were all within normal limits. (R. at 472–74). Dr. Her-sonskey also noted that the results of Plaintiff's March 2006 EMG were normal. (*Id.* at 474). The ALJ was free to credit the ME's opinion that these results are not con-sistent with someone who—only three months later—was seriously limited in her ability to stand, walk, sit, lift, carry, bend, and push/pull. (*Id.* at 510). Further, Dr. Hersonskey does not indicate what clinical results support his August 2006 opinion or why they changed in the preceding three months.

Plaintiff also contends that the ALJ should have recontacted Dr. Hersonskey to clarify the total amount of time that Plaintiff could stand or sit. (Mot. 10). An ALJ has a duty to develop a full and fair record. *Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir. 1991). The applicable regulations require an ALJ to recontact a treat-ing physician when the evidence received "is inadequate for [her] to determine whether [the claimant is] disabled." 20 C.F.R. §§ 404.1512(e), 416.912(e); *see also* SSR 96–5p (stating if "the adjudicator cannot ascertain the basis of the [treating source's] opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."). The regulations also state that an ALJ will seek additional evidence or clarification when: (1) the report from the treating physician contains a conflict or ambiguity that must be resolved; (2) the report does not contain all the necessary information; or (3) the report does not appear to be based on medically acceptable clinical and la-

boratory diagnostic techniques. 20 C.F.R. §§ 404.1512(e)(1), 416.912(e); *accord Brown v. Astrue*, No. 10 C 2153, 2012 WL 280713, at *17 (N.D. Ill. Jan. 30, 2012). Here, there was no reason to recontact Dr. Hersonskey. Even if Dr. Hersonskey had been able to clarify the total amount of time that Plaintiff could stand or sit, his August 2006 opinion would still have been inconsistent with his July opinion—and without clinical support. Moreover, Dr. Hersonskey acknowledged in his August 2006 opinion that Plaintiff had demonstrated "much improvement" from her ongoing physical therapy and that he expected more positive results once she completed the sessions. (R. at 509). Finally, as discussed above, the medical record does not support Dr. Hersonskey's limitations.

### 3. Summary

In sum, the ALJ provided good reasons supported by substantial evidence in the record for giving the opinions of Drs. Vera and Hersonskey little weight. It was the ALJ's responsibility to resolve the conflict between the ME's opinion and those of the treating physicians. *See Books*, 91 F.3d at 979 (ALJ must decide which doctor to believe). Because the ME was board certified in internal medicine, with extensive experience with the Agency's regulations, and was interpreting the relevant medical records, the ALJ properly rejected the treating physicians' opinions in favor of the ME's conclusions. *See Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the

requirement that the ALJ's decision be supported by substantial evidence."); *Hofslien v. Astrue*, 439 F.3d 375, 377 (7th Cir. 2006) ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances.").

## B. Credibility

Plaintiff contends that the ALJ erred in discounting her testimony about the nature and extent of her ailments. (Mot. 11–12). She asserts that the ALJ used meaningless boilerplate to discount her credibility, and "appears to be both crediting [her] allegations of pain, but doubting her sincerity because [she] has not undergone invasive procedures." (*Id.* 11).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore

*circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

### 1. Boilerplate Language

Plaintiff contends that the ALJ used meaningless boilerplate language to discredit her statements, which resulted in result-oriented decision making. (Mot. 11). In her decision, the ALJ stated in part:

> After careful consideration of the evidence, I find that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 43). This is the same language that the Seventh Circuit has repeatedly described as "meaningless boilerplate" because it "yields no clue to what weight the [ALJ] gave the testimony" and fails to link the conclusory statements made with the objective evidence in the record. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). The ALJ did that here.

In her decision, the ALJ also stated:

> While the record supports [Plaintiff's] consistent complaints of and treatment for low back pain, [Plaintiff] has only sought conservative treatment, such as pain medications and physical therapy, and has not undergone more aggressive treatment, such as epidural steroid injections, to alleviate her pain. Additionally, in May 2006, [Plaintiff] stated to Dr. Vera that she was not interested in back surgery.
>
> \*      \*      \*
>
> While [Plaintiff] alleges severe pain, the objective findings in the 2009 EMG and cervical spine MRI, as well as her lumbar spine MRIs, are fairly minimal and [Plaintiff] has only sought conservative treatment. There is no evidence of any concentration difficulties or frequent interference due to pain. She does not take pain medication every day because she does not want to get addicted, and testified that she used it about 4 times per week when her pain is severe. [Plaintiff] also indicated that her pain and mood is affected by weather and that when it is nice outside, she feels better. On good days, she indicated that she spends up to 2 hours helping her children with homework and cleans the house. She cooks 2 to 3 days per week and drives occasionally. The totality of the evidence does not support the level of limitation alleged by [Plaintiff].

(R. at 43–44, 46–47). These statements allow the Court to sufficiently analyze what the ALJ relied on when she concluded that Plaintiff was not credible. *See Pepper*, 712 F.3d at 368.

## 2. *The ALJ Provided Specific Reasons for Her Credibility Finding*

Plaintiff argues that the ALJ's credibility determination cannot be based on the ALJ's personal opinion regarding a claimant's prescribed treatment or choice not to undergo invasive procedures or surgery. (Mot. 11–12). The Court agrees that the ALJ cannot discount Plaintiff's credibility *merely* for declining surgery, *see* SSR 96-7p, at *7 (cautioning the ALJ not to "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment"), but the ALJ's failure to consider Plaintiff's explanations does not undermine the ALJ's other reasons for finding Plaintiff's statements about the extent of her limitations incredible, *see McKinzey v. Astrue*, 641 F.3d 884, 890–91 (7th Cir. 2011) (affirming ALJ's credibility determination although two of three reasons given by ALJ were without merit). Here, the ALJ's credibility determination is not based merely on Plaintiff's decision not to pursue surgery. Instead, the ALJ observes that far less aggressive treatments than surgery, such as epidural steroid injections, additional pain medications, more physical therapy sessions, or a pain clinic referral, were never sought by Plaintiff or suggested by her treating physician. Indeed, other than two seemingly random

comments about Plaintiff declining surgery, her treating physicians never discussed the need for more aggressive treatment.

Moreover, the ALJ rejected Plaintiff's credibility for a host of reasons besides the history of conservative treatment. The ALJ noted that Plaintiff's intermittent use of pain medications, successful physical therapy, and lack of concentration and interference issues all militate against Plaintiff's credibility. Significantly, the medical records do not support Plaintiff's testimony that her back pain causes her severe limitations. The objective findings in the EMGs and MRIs were quite minimal: the February 2006 MRI found no spinal stenosis or nerve root displacement (R. at 468–69); the March 2007 EMG results were unremarkable—no evidence of peripheral neuropathy, cervical radiculopathy, or lumbosacral radiculopathy (*id.* at 535); the September 2007 MRI results were "entirely unchanged from the previous exam" (*id.* at 552); the October 2009 EMG found mild to moderate radiculopathy at C6-7, L4-5, and L5-S1, but the nerve conduction study results were normal (*id.* at 594–95, 621–22); and the October 2009 MRI results were generally unremarkable—mild degenerative changes of the cervical spine causing minimal neural foraminal narrowing was found, but no significant central canal stenosis was seen and the lumbosacral spine was normal (*id.* at 610–11). And, as discussed above, the medical record supports the ME's conclusion that Plaintiff's lower back pain was controlled by conservative treatment. Her medications were generally to treat mild to moderate pain. *See supra* notes 5, 7, 8, 9, 10. Plaintiff often commented that her lower back pain was under control and she did not need her medications. (R. at 479, 520, 546, 623).

On frequent visits to her treating physician, Plaintiff had *no* complaints of back pain. (*Id.* at 481–84, 548, 562, 565, 567, 569, 626–30, 634). On other occasions, she described her back pain as merely an "ache." (*Id.* at 478, 486, 519, 598). Finally, after completing a physical therapy regimen, Plaintiff had full range of motion with *no* pain or functional limitations. (*Id.* at 556).

Plaintiff cites *Bauer* for the proposition that her abilities to do housework and help her children with homework *on her good days* do not undermine her credibility. (Mot. 12). But the *Bauer* claimant suffered from bipolar disorder and was under continuous treatment for it with "heavy drugs." 532 F.3d at 608–09. Under those circumstances, the Seventh Circuit observed that "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Id.* at 609. Here, on the contrary, as discussed above, Plaintiff has been treated with mild to moderate pain medications, which she often does not take because her pain is under control.

In sum, while Plaintiff has demonstrated some nondisabling symptoms, the ALJ properly concluded that "the record medical evidence established that those symptoms are largely controlled with proper medication and treatment." *See Skinner*, 478 F.3d at 845. The Court finds that the ALJ's credibility determination was not "patently wrong." *See Craft*, 539 F.3d at 678. The finding was supported by substantial evidence and was specific enough for the Court to understand the ALJ's reasoning. *See Moss*, 555 F.3d at 561.

## C. Step Four

On May 6, 2006, Plaintiff submitted a Work History Report. (R. at 406–15). In that report, Plaintiff stated that from 1993 through 2000, she was employed as a machine operator, which involved occasionally lifting no more than 20 pounds and frequently lifting 10 pounds. (*Id.* at 408–09); *see* SSR 82-62, at *3 ("The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work."). From 2000 through 2005, Plaintiff was employed as a secretary. (R. at 408).

At step four, based on Plaintiff's RFC and the VE's testimony, the ALJ determined that prior to September 3, 2009, Plaintiff was capable of performing past relevant work as a machine operator and secretary/dispatcher. (R. at 47). A claimant retains the capacity to perform past relevant work if she *either* "retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it" *or* "retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy." SSR 82-61, at *1–2. Plaintiff contends that the ALJ's step four findings are "unsupported and unexplained." (Mot. 13). She argues that "the VE did not provide any additional information regarding job tasks, nor was any detailed information elicited from Plaintiff." (Reply 5).

Plaintiff misapprehends both the VE's testimony and the ALJ's finding. The VE, having reviewed Plaintiff's Work History Report, testified that a machine operator

is a medium, unskilled job as defined by the Dictionary of Occupational Titles (DOT),[12] but that Plaintiff performed the job at the *light exertional level*. (R. at 96–97). The VE testified further that someone who has the RFC to do *light work* (lifting 20 pounds occasionally and 10 pounds frequently); stand, walk, and sit for six hours; occasionally climb ramps and stairs; and frequently balance, stoop, kneel, crouch, and crawl could perform the job of machine operator *as Plaintiff performed it* and the job of secretary both as Plaintiff performed it and as customarily performed in the national economy. (*Id.*); *see* SSR 82-61, at *1–2 (A claimant retains the capacity to perform past relevant work if she "retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it.").

Plaintiff contends that the VE testified "that the jobs could not be performed unless Plaintiff could use both hands frequently." (Mot. 13). But Plaintiff's RFC *prior* to September 3, 2009, does not limit her to frequent use of her hands. (R. at 42). Accordingly, the VE's testimony applies only to a different set of limitations—those that the ALJ adopted *beginning* September 3, 2009. (*Id.* at 97–98; *see id.* at 42, 47–48).

Thus, based on the ALJ's factual finding as to Plaintiff's RFC prior to September 3, 2009, and the VE's factual finding that the actual physical demands of Plaintiff's

---

[12] The Dictionary of Occupational Titles (DOT), published by the Department of Labor, gives detailed physical requirements for a variety of jobs. *Prochaska v. Barnhart*, 454 F.3d 731, 735 n. 1 (7th Cir. 2006). The Social Security Administration has taken "administrative notice" of the DOT. *See* 20 C.F.R. § 416.966(d)(1).

prior job as machine operator amounted to light work, the ALJ properly found that Plaintiff could perform her job as machine operator as she performed it. And, even assuming *arguendo* that the ALJ's machine-operator finding was in error, Plaintiff can clearly perform the sedentary position of secretary prior to September 3, 2009, both as she performed it and as customarily performed in the national economy.

## D. Step Five

The ALJ determined that beginning on September 3, 2009, Plaintiff was unable to perform any past relevant work. (R. at 47). However, the ALJ also found that Plaintiff was able to perform all or substantially all of the requirements of light work, with some exertional limitations. (*Id.* at 48; *see id.* at 42). Therefore, considering Plaintiff's RFC, age, education, work experience, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including work as an usher—3,000 jobs—and parking lot attendant—700 jobs, such that she is not disabled. (*Id.* at 47–48). Plaintiff contends that the ALJ's finding is not supported by the information cited by the VE. (Mot. 12). Plaintiff argues that she does not have the transferrable skills to perform work as an usher and that her RFC precludes working as a parking lot attendant. (*Id.* 13–15; Reply 4–5).

Plaintiff misapprehends the ALJ's findings. Plaintiff initially contends that "[t]he ALJ issued an alternate step five finding, which would pertain if the step four finding is reversed and also for the period prior to September 3, 2009." (Mot. 12). On the contrary, because the ALJ found that Plaintiff has additional limitations of her

upper extremities as of September 3, 2009, she determined that Plaintiff was unable to perform past relevant work as of that date. (R. at 42, 47). Thus, the step-five finding was not in the alternative; instead, the step-four finding applies only for the period before September 3, 2009, and the step-five finding only for the period beginning on September 3, 2009. (*Id*. at 47–48).

Next, Plaintiff argues that the ALJ erred in finding that she was capable of working as an usher because it is a semi-skilled position, which requires transferable skills. (Mot. 13–14). She contends that the usher position cannot be considered because the ALJ did not seek testimony from the VE "whether Plaintiff had any transferable skills, and if so, whether those skills would transfer to the usher position." (*Id*. 14). Where transferability is an issue, an ALJ must make certain findings regarding the acquired skills and the occupations to which they may be transferred. SSR 82-41. As explained below, however, the ALJ correctly found that transferability was not material here.

The Medical Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (Grids) are based on vocational factors of age, education, and work experience in combination with each of the possible strength categories of work, i.e. sedentary, light, medium, heavy, and very heavy. Grids § 200.00(a). Where the findings of fact coincide with all of the criteria for one of the rules, the Grids will direct a conclusion as to whether the claimant is or is not disabled. *Id*. The rules are based on administrative notice of the numbers of jobs in the national economy at the various combinations of strength categories and vocational factors. *Id*. § 200.00(b). Where a rule directs a

finding of not disabled, the existence of a significant number of jobs in the national economy is presumed for an individual who meets all the combined factors contemplated by the rule. *Id.* Where a given rule directs a finding of disabled, the absence of significant numbers of jobs is presumed. *Id.*

For some claimants, like Plaintiff, additional exertional limitations impede the ability to perform the full range of work in a given strength category. "In such cases, the Medical–Vocational Rules still carry weight and must be used as a framework to guide the decision." *James v. Colvin*, No. 12 CV 1815, 2013 WL 6145297, at *4 (D. Or. Nov. 21, 2013); *see* Grids § 200.00(e)(2). "For that purpose, the applicable rule is the one that corresponds to the claimant's maximum residual strength and vocational factors." *Id.* (citing Grids § 200.00(e)(2)).

Here, the ALJ found that Plaintiff was a "younger individual age 18–49," has a limited education, and is able to communicate in English. (R. at 47); *see* Grids § 200.00(h)(1). Plaintiff does not contest these findings. If Plaintiff was capable of performing the full range of light work, the Grids directs a decision of "not disabled" regardless of whether Plaintiff had transferable skills from her previous work. Grids §§ 202.17, 202.18, 202.19; (*see* R. at 48). The ALJ recognized that because Plaintiff has limitations impeding the full range of light work, the Grids were not conclusive and a VE had to be consulted. *Thomas v. Barnhart,* 278 F.3d 947, 960 (9th Cir. 2002); *James*, 2013 WL 6145297, at *4. Nevertheless, because the Grids presumptively determine that transferability of skills is not an issue for a person of Plaintiff's age, education, and communication skills, the ALJ was not required by

SSR 82-41 to determine whether she has any transferable work skills. *James*, 2013 WL 6145297, at \*4; *see Fast v. Barnhart*, 397 F.3d 468, 470–71 (7th Cir. 2005); Grids § 200.00(e)(2). Thus, it was appropriate for the ALJ to rely upon the VE's testimony that a person with Plaintiff's RFC could work as an usher. *Haynes v. Barnhart*, 416 F.3d 621, 628 (7th Cir. 2005) (in situations where the claimant can perform the full range of a particular category of work, e.g. light, subject to additional exertional limitations, the ALJ should consider the Grids as a framework and consult with a VE to determine if the claimant is disabled).

Finally, Plaintiff contends that the parking lot attendant position requires frequent reaching, handling, and fingering, which exceeds the limitation to occasional left upper extremity use. (Mot. 14; *see* R. at 42). However, the VE specifically testified that with Plaintiff's manipulative limitations to frequent use of her right upper extremity and only occasional use of her left upper extremity, she "could perform as a parking lot attendant at a self-serve parking lot." (R. at 98). The VE explained that self-service parking-lot attendants "do not operate vehicles, as may [be] described in the DOT."[13] (*Id.*). Thus, unlike many light work positions, self-service parking-lot attendants "do [not] require bilateral use of the hands." (*Id.* at 98–99). Plaintiff's counsel did not raise any discrepancies between the DOT and the VE's testimony during the hearing. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (stating that an ALJ is not required to reopen the record when plaintiff iden-

---

[13] The physical demands of a parking-lot attendant include frequent reaching, handling, and fingering. U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* 365 (1993).

tifies a discrepancy between the VE's testimony and the DOT after the hearing); *Harris v. Astrue*, 646 F. Supp. 2d 979, 995–96 (N.D. Ill. 2009) ("Since plaintiff's counsel did not raise during cross-examination of the VE, or at any other point in the hearing, the discrete inconsistency now raised, the ALJ was not required to further investigate the VE's testimony."). Moreover, even if Plaintiff was unable to work as a self-service parking-lot attendant, a significant number of other jobs— 3,000 usher positions—remain available. "[I]t appears to be well-established that 1,000 jobs is a significant number." *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009).

## E. Summary

In sum, the ALJ has built an accurate and logical bridge from the evidence to her conclusion. The ALJ's credibility, weight to be accorded the treating physicians, and step four and five determinations are all supported by substantial evidence. Pursuant to sentence four of 42 U.S.C. § 405(g), the Court affirms the Commissioner's decision.

## VI. SENTENCE SIX REMAND

In the alternative, if the Court denies her request to remand on the merits, Plaintiff moves for remand pursuant to sentence six of 42 U.S.C. § 405(g).[14] (Dkt.

---

[14] Sentence six of § 405(g) states: "The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ."

20). She argues that the Commissioner's failure to include the February 2008 hearing transcript in the administrative record warrants remand. The Court finds Plaintiff's argument unpersuasive.

On February 22, 2008, Plaintiff testified at a hearing before an ALJ. (R. at 113). The ALJ denied Plaintiff's request for benefits on April 24, 2008. (*Id.* at 113–20). On August 18, 2009, the Appeals Council granted Plaintiff's request for review, vacated the April 2008 decision, and remanded. (*Id.* at 121–23). As part of its remand order, the Appeals Council decision instructed the ALJ to offer Plaintiff an opportunity for a new hearing. (*Id.* at 123). On remand, Plaintiff testified at the hearing at issue in this appeal. (*Id.* at 38, 55–105). The February 2008 hearing is not relevant to the current decision. Indeed, in the current decision, the ALJ—who did not preside over the earlier hearing—does not reference or rely on any testimony from the February 2008 hearing. (*See id.*).

Moreover, even if the February 2008 hearing was relevant to the current decision, Plaintiff has not provided any credible explanation for how she could use the hearing transcript to her advantage. Without providing any specifics, Plaintiff suggests that the testimony of the medical expert Walter J. Miller, Jr., M.D, at the February 2008 hearing *could* be helpful to her case. (Dkt. 39 at 1–2). But this contention is directly contrary to what she argued at the time. In her request for review of the April 2008 decision—which was authored by Plaintiff's present counsel—Plaintiff criticized the ALJ for "improperly rel[ying] on the testimony of the ME [Dr.

Miller] who had not treated [Plaintiff] and was not familiar with her medical conditions." (R. at 448; *see id.* at 446–50).

Finally, Plaintiff asserts that the failure to include the February 2008 transcript is contrary to the Commissioner's own policies. (Dkt. 39 at 2–3). The Commissioner's internal guidelines require an ALJ to provide an ME with "a transcript or summary of any medical testimony provided in a prior hearing on the same case." HALLEX I-2-5-38(C)(5).[15] However, this guideline makes sense only in those instances where the prior hearing remains viable—e.g., the Appeals Council or federal court remands with instructions to consider portions of the prior hearing—or where the ALJ intends to rely on the prior hearing testimony. None of these situations apply here. Nor has Plaintiff articulated a specific prejudice from the failure to provide Dr. Jilhewar—the ME at the June 2010 hearing—with a transcript of Dr. Miller's testimony. *Cf. Shave v. Apfel*, 238 F.3d 592, 596–97 (5th Cir. 2001) (prejudicial violations of HALLEX entitle a claimant to relief). Consequently, the Court declines to remand this case merely to supplement the record with immaterial information.

---

[15] The Hearings, Appeals and Litigation Law Manual (HALLEX) is a policy manual written to convey "guiding principles, procedural guidance and information to the Office of Hearing and Appeals Staff." HALLEX I–1–001. Courts may look to the HALLEX as a guide for procedural rules in Social Security cases. *DiRosa v. Astrue*, No. 10 C 7243, 2012 WL 2885112, at *5 (N.D. Ill. July 13, 2012); *see Perkins v. Chater,* 107 F.3d 1290, 1294 (7th Cir. 1997). However, the Seventh Circuit has refused to find that the Commissioner's failure to follow a provision of HALLEX is reversible error. *Murphy v. Astrue,* 496 F.3d 630, 636 (7th Cir. 2007); *Perkins,* 107 F.3d at 1294; *see DiRosa,* 2012 WL 2885112, at *5.

## VII. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [19] and Motion for Remand Pursuant to Sentence Six [20] are **DENIED**, and Defendant's Motion for Summary Judgment [28] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.


E N T E R:

Dated: December 18, 2013

_____
MARY M. ROWLAND
United States Magistrate Judge